IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


MARK WEAVER                                                                    PLAINTIFF


        v.                                    Civil No. 08-5195


CAPTAIN HUNTER PETRAY,
Jail Administrator, Benton County
Detention Center; BENTON COUNTY,
ARKANSAS; and SHERIFF
KEITH FERGUSON                                                                 DEFENDANTS


## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

The plaintiff, Mark Weaver (hereinafter Weaver), filed this civil rights action pursuant to 42

U.S.C. § 1983. He proceeds *pro se* and *in forma pauperis*.

Weaver is currently incarcerated at the Arkansas Department of Correction. In this action,

Weaver contends his constitutional rights were violated while he was incarcerated in the Benton

County Detention Center from April 23, 2008, to May 26, 2009.[1] Specifically, he contends he was

subjected to unconstitutional conditions of confinement.

Defendants filed a summary judgment motion (Doc. 20). To assist Weaver in responding to

the summary judgment motion, a questionnaire was propounded (Doc. 28) by the Court. Weaver

filed a timely response to the questionnaire (Doc. 29). The summary judgment motion is before the

undersigned for issuance of this report and recommendation.

---

[1] The booking records submitted by Defendants as Exhibit 1 do not indicate Weaver's release date. However, the
Arkansas Department of Correction's website indicates Weaver's initial receipt date was May 26, 2009. *See*
www.adc.arkansas.gov.

## Background

Weaver was booked into the Benton County Detention Center (BCDC) on April 23, 2008, on pending criminal charges. *Plaintiff's Response* (Doc. 29)(hereinafter *Plff's Resp.*) at ¶ 1. When booked in, Weaver signed a copy of the inmate rights and rules. *Id.* at ¶ 2.

On May 13th, Weaver complained that the food trays were dirty. *Defendants' Exhibit* 3 (hereinafter *Defts' Ex.*). Captain Petray (hereinafter Petray) responded that the trays were cleaned daily. *Id.* Weaver maintains that Petray had no way of knowing if his tray was clean or not. *Plff's Resp.* at ¶ 4(A). Further, he states the cleaning consisted of squirting water on the trays. *Id.* at ¶ 4(B).

On June 1st, Weaver complained that the cell block was cleaned only once a day by trustees and that the inmates were not provided with safe, sanitary and orderly jail conditions. *Defts' Ex.* 3. Petray responded, "Cleaning supplies are brought in daily. Inmates are responsible for cleaning their own living areas. If you want to help them you are more than welcome to pick up a broom and a mop and help out." *Id.*

Weaver asserts he was "forced to clean the showers." *Plff's Resp.* at ¶ 5(A). He denies he had access to cleaning supplies on a daily basis. *Id.* at ¶ 5(B) & ¶ 6. He asserts that "[s]ometimes no cleaning supplies were brought in." *Id.* Further, he states that the day room was supposed to be cleaned after every meal and this just did not happen. *Id.* at ¶ 6.

Weaver, in a grievance submitted on June 8th, indicated that besides himself there were other men in the jail who had the same feelings towards the trash, dirt and filth in the jail and that they would offer to clean on a daily basis. *Plff's Resp.* at ¶ 6. Petray responded, "Cleaning supplies are brought in daily. You are more than welcome to pick up a mop and broom and clean." *Id.*

Weaver complained on June 18th that during clean up the mop was put in the commode and the floor was mopped. *Plff's Resp.* at ¶ 7(A). Petray responded, "I will have the sgt. check on this. Who did this?" *Id.* Weaver states he did let Petray know who was responsible for this. *Id.* at ¶ 7(A). However, the practice did not stop. *Id.* at ¶ 7(B). In this regard, Weaver states: "How could it stop. The inmates have no rights to tell another inmate what to do. Deputies spend 96% of [their] time in pod control. They might walk through once on a shift." *Id.*

On June 19th, Weaver complained that the public restroom[2] did not conform to the inmates' right to be provided conditions of confinement that are safe, sanitary and orderly. *Plff's Resp.* at ¶ 8(A). He complained that the public restroom was cleaned with a mop that had been dipped into the commode. *Id.* Petray responded, "I will have the sgt. Check on this." *Id.*

As far as he knows, Weaver states the commode was not cleaned before the mop was used. *Plff's Resp.* at ¶ 8(C). In fact, Weaver asserts the commode was never cleaned. *Id.* When the mop was dipped in the commode, he indicates there were no cleaning chemicals in the commode, on the mop, or on the floor. *Id.* at ¶ 8(E). Weaver states the inmates only had flip flops to wear on their feet. *Id.* at ¶ 8(D).

On June 24th, Weaver submitted a third grievance regarding this practice. *Plff's Resp.* at ¶ 9. He stated: "I sat down this morning after breakfast to just watch the clean up. And sure enough, as soon as the mop came out, it went straight to the public restroom, into the commode, and onto the floor." *Id.* Lt. Carter responded, "A sergeant will look into this." *Id.*

On June 25th, Weaver again complained that the mop had been dipped in the commode and then used to mop the public restroom and day room. *Defts' Ex.* 3; *Plff's Resp.* at ¶ 10 (without

---

[2] When the inmates are in the day room, one cell is left open for the inmates to use as a restroom. This open cell is typically referred to as the public restroom.

knowledge to agree or disagree). Lt. Carter responded that he would advise the shift sergeants of the issue. *Id.*

On June 28th Weaver submitted a request stating: "Congratulations! I actually got to see a deputy add some comet to the showers and around the lavatory/commode in the public bathroom. This is a start at helping get this filthy place cleaned up." *Plff's Resp.* at ¶ 11. Jail personnel responded, "What is your request?" *Id.*

Weaver complained on July 4th that the shower was dirty with "soap and human scum." *Plff's Resp.* at ¶ 12. Petray responded that he would check on the matter. *Id.* Weaver in responding to the summary judgment motion adds that "[h]uman seaman (sic) was in the showers quite often. Along with all sorts of scum." *Id.*

On July 31st, Weaver submitted a grievance stating that water was standing in front of the showers on the top tier and that a mop and bucket should be left out so that the water could be cleaned up before and after showers. *Defts' Ex.* 3; *Plff's Resp.* at ¶ 13(A)(Without knowledge to agree or disagree). Petray responded that he would check with maintenance about the problem. *Id.*

Weaver maintains the inmates tramped through standing water from the top tier shower for weeks. *Plff's Resp.* at ¶ 13(A). This was true despite his complaint. At the time, Weaver was housed in the top tier of D cell. *Id.* at ¶ 23(B). The water was deep enough to come over his flip flops. *Id.* at ¶ 13(B). He asserts there was nothing the inmates could do to keep the water from escaping the shower. *Id.* He indicates he slipped in the water and pulled a muscle in his back. *Id.* As a result, he states he was in extreme pain in his back and legs. *Id.* at ¶ 32. Weaver states he told Nurse Marsha and received two Tylenol in response. *Id.*

On August 6th, Weaver complained he had to walk through stagnant shower water every time he went to his cell. *Defts' Ex.* 3; *Plff's Resp.* at ¶ 14 (Without knowledge to agree or disagree). He

asserted that it was a health hazard. *Id.* Petray responded, "I have forwarded this to maintenance."
*Id.*

On September 2nd, Weaver submitted a grievance stating there was dirt on his food tray near the meat. *Defts' Ex.* 3; *Plff's Resp.* at ¶ 15(A)(Without knowledge to agree or disagree). He stated that more care needed to be taken when things were washed. *Id.* Petray responded, "The trays are cleaned." *Id.* Weaver was asked whether September 2nd was the first time since May 13th that his food tray had dirt on it. *Plff's Resp.* at ¶ 15(B). He responded no, that dirt was always present either on the food or the tray. *Id.* He submitted another complaint on September 3rd. *Id.* at ¶ 16(A).

While the BCDC has an established, written policy concerning sanitation, Weaver maintains it is not followed. *Plff's Resp.* at ¶ 18(A). According to Weaver, the floors under the tables were not cleaned three times a day, people were sleeping on the floor in the cell used as a public bathroom, and there was black fungus around the walls, in the closets, and in the vents. *Id.*

Weaver agrees the employee assigned as "pod rover" dispenses cleaning materials and supplies on an as needed basis. *Plff's Resp.* at ¶ 18(C). The supply and janitorial closet is kept locked when the employee is not at the closet getting or returning supplies. *Id.*

Weaver concedes inmates are responsible for cleaning their own living areas. *Plff's Resp.* at ¶ 19. According to Weaver, inmates were not provided with rubber gloves to clean commodes or showers. *Id.* at ¶ 21. He maintains they were simply supplied with a broom, mop, and bucket. *Id.* at ¶ 26. He asserts the mop bucket is missing the part that squeezes the water out of the mop. *Defts' Ex.* 3 (Doc. 22-5) at page 20.

Weaver disagrees that cleaning supplies are placed in the housing unit immediately following meals. *Plff's Resp.* at ¶ 18(D). Instead, he states it could be up to four hours before the inmates got

the supplies. *Id.* In fact, he asserts sometimes they never got the supplies. *Id.* The closest thing to an inspection is when a deputy does a walk down. *Id.* at ¶ 18(F).

According to Weaver, the jail is never inspected for cleanliness. *Plff's Resp.* at ¶ 18(F). In the whole time he was there, Weaver states he only saw Petray in the barracks twice. *Id.* He indicates one of those times was during a shakedown. *Id.* While Defendants maintain the facility is sprayed for insects/spiders every month and is sprayed outside once every three months, Weaver states he only saw it being sprayed for bugs once. *Plff's Resp.* at ¶ 25.

During his incarceration at the BCDC, Weaver maintains he was supplied with insufficient nutrition. *Plff's Resp.* at ¶ 29(A). He states he weighed 242 pounds when he was booked in and when he was transferred he weighed 152 pounds. *Id.*

He was provided with clothing. *Plff's Resp.* at ¶ 29(B). He had a bunk or a mattress to sleep on each night. *Id.* at ¶ 29(C). The inmates were able to shower on a regular basis but did not get to shave or have a haircut unless they were going to court. *Id.* at ¶ 29(D). He was able to send and receive mail. *Id.* at ¶ 29(E). He denies the detention center was maintained at a reasonable temperature. *Id.* at ¶ 29(F). He says: "If it was a reasonable temperature why was a blanket required to stay warm with. Deputies even wore [their] coats inside to stay warm." *Id.*

### Summary Judgment Standard

Summary judgment is appropriate if, after viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party, <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986), the record "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). "Once a party moving for summary judgment has made a sufficient showing, the burden rests with the non-moving party to set forth specific facts, by affidavit or other

evidence, showing that a genuine issue of material fact exists." National Bank of Commerce v. Dow

Chemical Co., 165 F.3d 602, 607 (8th Cir. 1999).

The non-moving party "must do more than simply show that there is some metaphysical doubt

as to the material facts." Matsushita, 475 U.S. at 586. "They must show there is sufficient evidence

to support a . . . verdict in their favor." National Bank, 165 F.3d at 607 (citing Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)). "A case founded on

speculation or suspicion is insufficient to survive a motion for summary judgment." Id. (citing Metge

v. Baehler, 762 F.2d 621, 625 (8th Cir. 1985)).

## Discussion

As mentioned above, Defendants have now moved for summary judgment. First, Defendants

argue Plaintiff was not subjected to unconstitutional conditions of confinement. Second, they argue

Plaintiff suffered no actual physical injury as a result of the conditions he was confined under.

Finally, they argue that Plaintiff has brought only official capacity claims against them and as there

is no suggestion of an unconstitutional custom or policy they are entitled to judgment as a matter of

law.

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel

and unusual punishment. U.S. Const. amend. VIII. The Cruel and Unusual Punishment Clause of

the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of

pain," or are "grossly disproportionate to the severity of the crime." Rhodes v. Chapman, 452 U.S.

337, 347, 101 S. Ct. 2392, 69 L. Ed. 2d 59 (1981). See also Nelson v. Correctional Medical

Services, 583 F.3d 522, 528 (8th Cir. 2009)(en banc). For conditions of confinement cases,

wantonness is the equivalent of deliberate indifference.[3] See Wilson v. Seiter, 501 U.S. 294, 302-04, 111 S. Ct. 2321, 115 L. Ed. 2d 271 (1991).

"A prisoner alleging an Eighth Amendment violation must prove both an objective and subjective element. Revels v. Vincenz, 382 F.3d 870, 875 (8th Cir. 2004)(citing Wilson, 501 U.S. at 298). "The defendant's conduct must objectively rise to the level of a constitutional violation by depriving the plaintiff of the minimal civilized measure of life's necessities. The defendants' conduct must also reflect a subjective state of mind evincing deliberate indifference to the health or safety of the prisoner" Revels, 382 F.3d at 875 (citations and internal quotation marks omitted). Deliberate indifference is established when the plaintiff shows "the defendant was substantially aware of but disregarded an excessive risk to inmate health or safety." Revels, 382 F.3d at 875. The standards against which a court measures prison conditions are "the evolving standards of decency that mark the progress of a maturing society." Estelle v. Gamble, 429 U.S. 97, 102, 97 S. Ct. 285, 50 L. Ed. 2d 251 (1976).

Weaver complains generally about the unsanitary conditions in the jail and the diet provided. With respect to Weaver's claim about the diet he receives, we note that he has filed a separate case in which he claims the diet and food service was inadequate, Weaver v. Holly, et al, Civil No. 09-5117. It will therefore be recommended that the claims regarding his diet and the unsanitary food trays be dismissed as they are duplicative of the claims raised in Weaver v. Holly, et al, Civil No. 09-5117.

---

[3] The Court of Appeals for the Eighth Circuit has adopted the Eighth Amendment's deliberate indifference standard for both detainees and convicted inmates. See Butler v. Fletcher, 465 F.3d 340, 344 (8th Cir. 2006)(adopting the Eighth Amendment's deliberate indifference standard as the "appropriate standard of culpability for all claims that prison officials failed to provide pretrial detainees with adequate food, clothing, shelter, medical care and reasonable safety.)" Thus, Weaver's date of conviction is not relevant to this case.

Weaver's remaining claims all concern the issue of sanitation. In discussing unsanitary conditions of confinement claims, the Eighth Circuit has noted that conditions, "such as a filthy cell, may be tolerable for a few days and intolerably cruel for weeks or months." *Whitnack v. Douglas County*, 16 F.3d 954, 958 (8th Cir. 1994)(internal quotation marks and citation omitted). The court considered both the length of time a prisoner must endure the filthiness and the level of filthiness. *Id.*

Here, Weaver identifies the following unsanitary conditions: dirt on the food or the food trays;[4] general dirt, filth, and trash in the cell block; the mop being dipped in the commode and then used to clean the floor; soap and human scum in the shower; standing water in front of the showers; a black fungus around the walls, in the closets, and vents; spiders and insects in the cells; and inmates not being provided with gloves to be used while cleaning.

It is undisputed that a jail policy placed the responsibility on inmates to maintain the cleanliness of their own living areas. *Resp.* at ¶ 19. With respect to the showers, Weaver states he was "forced to clean the showers. Deputy Wells made sure of it." Weaver agrees the employee assigned as pod rover dispensed cleaning materials and supplies on an as needed basis. *Plff's Resp.* at ¶ 18(C).

Weaver does not maintain that he was prevented from cleaning his living areas or that he was not provided with an opportunity to clean his living areas. A detention facility does not violate the Eighth Amendment standards by giving inmates access to cleaning supplies and requiring them to keep their own living areas clean. Wilson, 501 at 304 (Eighth Amendment violation requires a jailer to deprive a prisoner of a "single, identifiable human need.").

---

[4]As noted above, all claims regarding the food service and the nutritional value of the meals provided are encompassed by Case No. 09-5117.

With respect to the standing water, Weaver submitted his first grievance regarding this condition on July 31st. *Plff's Resp.* at ¶ 13(A). Petray responded to Weaver's complaint by notifying maintenance. *Id.* Despite this, Weaver maintains the conditions went on for "weeks." *Id.* Weaver does not further quantify how long this condition lasted but he last mentioned it in a grievance dated August 6th. *Plff's Resp.* at ¶ 14. There is no indication Petray failed to advise maintenance of the problem. At most, the facts presented suggest Petray was negligent in failing to follow through and make sure the problem was solved quickly.

With respect to the black fungus, Weaver merely asserts that black fungus was present around the floor, closets, and vents. *Plff's Resp.* at ¶ 24. He does not point out any grievances in which he complained of the existence of a black fungus. He submits nothing to support his conclusory assertion. He presents nothing to suggest the Defendants were aware of this condition. Tokar, 97 F.3d at 1082 (Once defendants supported their motion for summary judgment, the "burden shifted to Tokar to go beyond his pleadings and 'by affidavits or . . . otherwise . . . set forth specific facts showing that there is a genuine dispute for trial.'")(quoting, Fed. R. Civ. P. 56(e)).

With respect to the presence of insects and spiders, Weaver did not disagree with Holly's statement that the BCDC is sprayed for insects/spiders every month and is also sprayed outside the facility every three (3) months. *Defts' Ex.* 4 at ¶ ; *Plff's Resp.* at ¶ 25 (Without knowledge to agree or disagree). Instead, he merely states he only observed "once that it was sprayed for bugs." *Plff's Resp.* at ¶ 25. Weaver was not bitten by a spider but states he was bitten by unknown bugs. *Id.* He does not indicate the bug bites were numerous or frequent. He does not argue the Defendants failed to take proper measures after he reported being bitten.

On the record before the Court, there is simply no genuine issue of fact as to whether the Defendants knew of a substantial risk to Weaver's health or safety and failed to take reasonable

measures to abate it. *Farmer*, 511 U.S. at 837. In summary, there is no genuine issue of fact as to whether Weaver suffered the level of objectively serious harm necessary to show an Eighth Amendment violation. *See e.g., Tokar v. Armontrout*, 97 F.3d 1078, 1082 (8th Cir. 1996).

<u>**Conclusion**</u>

For the reasons stated, I recommend that: (1) Weaver's claims regarding his diet and the unsanitary food trays be dismissed as they are duplicative of the claims raised in <u>Weaver v. Holly, et al</u>, Civil No. 09-5117; and (2) Defendants' motion for summary judgment (Doc. 20) be granted on all other claims and this case dismissed.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

**DATED** this **11th day of February 2010.**

/s/ *Erin L. Setser*
HON. ERIN L. SETSER
UNITED STATES MAGISTRATE JUDGE